# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## BROWNSVILLE DIVISION

| | |
|---|---|
| K.P.P.R., A.J.V.P, A.C.C.C., A.C.C.C., R.C.A.P., J.R.A.M., R.C.A.M., J.S.S.S., R.R.S., J.M.A., K.J.P.M., E.M.C., A.B.C.C., O.D.C.C., C.J.C.C., D.C.M.V., G.J.M.V., Y.A.C.B., D.J.U.V., W.R.O.P., E.J.M.A., J.A.B.M., O.W.J.M., individually, and on behalf of all Class members, | Case No. 1:21-cv-7 |
| *Plaintiffs*, | |
| v. | Date: January 11, 2021 |
| Chad F. Wolf, Acting Secretary of the Department of Homeland Security; Mark A. Morgan, Acting Commissioner of U.S. Customs and Border Protection; Jeffrey Rosen, Acting Attorney General; Donald J. Trump, President of the U.S. | |
| *Defendants*. | |

---

## CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

---

TO THE HONORABLE UNITED STATES DISTRICT COURT JUDGE:

This is a class action complaint for declaratory and injunctive relief.[1] The Plaintiffs, K.P.P.R., A.J.V.P, A.C.C.C., A.C.C.C., R.C.A.P., J.R.A.M., R.C.A.M., J.S.S.S., R.R.S., J.M.A., K.J.P.M., E.M.C., A.B.C.C., O.D.C.C., C.J.C.C., D.C.M.V., G.J.M.V., Y.A.C.B., D.J.U.V., W.R.O.P., E.J.M.A., J.A.B.M., and O.W.J.M., individually, and on behalf of all Class members herein, file the instant complaint against Defendants because the Trump administration's "Migrant Protection Protocols" ("MPP") violate the Immigration and Nationality Act ("INA"), the Administrative Procedure Act ("APA"), and Plaintiffs' due process rights under the Fifth Amendment of the U.S. Constitution. As such, Plaintiffs file this Complaint and request that this Court enjoin the MPP's application to Plaintiffs and all Class members herein.

Plaintiffs file the instant action against the following Defendants: Chad F. Wolf, Acting Secretary of the Department of Homeland Security ("DHS"); Mark A. Morgan, Acting Commissioner of U.S. Customs and Border Protection ("CBP"); Jeffrey Rosen, Acting Attorney General ("AAG"); and Donald J. Trump, the President of the United States.

---

[1] Plaintiffs will separately file a Motion for Class Certification after the Defendants are served with Plaintiffs' Complaint. In that Motion, Plaintiffs will define the Class and address why the Class should be certified.

## I.  INTRODUCTION

1.  Plaintiffs fled their home countries and entered the United States without inspection with the hopes of remaining here and seeking asylum. They were apprehended, but instead of being allowed to remain in the United States and seek asylum through their immigration proceedings, they were sent to Mexico and forced to remain there while their immigration proceedings go forward due to the MPP program that the Trump administration has put into place.

2.  The MPP program seeks to prevent individuals from Central and South American countries from entering the United States. Under the program, border agents do not allow individuals from those countries to remain in the U.S.; instead, forcing them to remain in dangerous border cities in Northern Mexico and requiring them to report to the port of entry whenever they have a court hearing.

3.  The MPP program violates decades of U.S. immigration law and policy and systemically denies aliens from Central and South American countries an opportunity to enter, be free from harm and persecution, and seek asylum in the United States.

4.  Noncitizens, such as Plaintiffs, have essentially been condemned to living in conditions that are dangerous and that threaten their very lives on a daily basis. For this reason, Plaintiffs request that this Court enjoin the MPP program's

applicability to them, as well as allow Plaintiffs to enter the United States to be reunited with their family members here and pursue their asylum claims in safety.

## II.  JURISDICTION AND VENUE

5.  This Court has jurisdiction over this Complaint pursuant to 28 U.S.C. §§ 2201-2202 and 28 U.S.C. § 1331.

6.  Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e)(1) because a substantial part of the events giving rise to this claim occurred in this judicial district.

## III.  PARTIES

7.  Plaintiffs K.P.P.R. and A.J.V.P are a mother and child. They fled Honduras and are currently forced to reside in Mexico due to the MPP program.

8.  Plaintiffs A.C.C.C. and A.C.C.C. ("A.C.") are a mother and child. They fled El Salvador and are currently forced to reside in Mexico due to the MPP program.

9.  Plaintiffs R.C.A.P., J.R.A.M., and R.C.A.M. are a father and two children. They fled El Salvador and are currently forced to reside in Mexico due to the MPP program.

10.  Plaintiffs J.S.S.S. and R.R.S. are a mother and child. They fled Guatemala and are currently forced to reside in Mexico due to the MPP program.

11.  Plaintiffs J.M.A. and K.J.P.M. are a mother and child. They fled Guatemala and

4

are currently forced to reside in Mexico due to the MPP program.

12. Plaintiffs E.M.C., A.B.C.C., O.D.C.C., and C.J.C.C. are a mother and three children. They fled El Salvador and are currently forced to reside in Mexico due to the MPP program.

13. Plaintiffs D.C.M.V. and G.J.M.V. are a mother and child. They fled El Salvador and are currently forced to reside in Mexico due to the MPP program.

14. Plaintiffs Y.A.C.B. and D.J.U.V. are a husband and wife. They fled Honduras and are currently forced to reside in Mexico due to the MPP program.

15. Plaintiff W.R.O.P. fled Nicaragua and is currently forced to reside in Mexico due to the MPP program.

16. Plaintiffs E.J.M.A., J.A.B., and O.W.J.M., are a mother and two children. They fled El Salvador and are currently being forced to reside in Mexico due to the MPP program.

17. Defendant, Chad F. Wolf, is the Acting Secretary of the DHS. He is sued in his official capacity.

18. Defendant, Mark A. Morgan, is the Acting Commissioner of the CBP who is responsible for the initial processing of aliens at the border. He is sued in his official capacity.

19. Defendant, Jeffrey Rosen, is the Acting Attorney General of the United States. He shares the responsibility of implementing asylum laws in the United States.

He is sued in his official capacity.

20. Defendant, Donald J. Trump, is the President of the United States. He is responsible for all the DHS's policies. He is sued in his official capacity.

## IV. BACKGROUND

21. The MPP program is the latest effort by the current administration to deny individuals from Central and South American countries from entering the United States and remaining here safely while their asylum case proceeds in the immigration court system.

22. The MPP program, implemented January 25, 2019, states that individuals arriving in or entering the United States from Mexico—illegally or without proper documentation—may be returned to Mexico for the duration of their immigration proceedings.[2]

23. Under the MPP program, the U.S. border officials initially detain asylum seekers at the border, process them, schedule their removal hearings, send them back to Mexico, and require them to come back to the port of entry to attend their court hearings.

24. There are no regulations governing the operation of the MPP program. It has been created solely through press releases and memorandums.

---

[2] https://www.dhs.gov/sites/default/files/publications/19_0129_OPA_migrant-protection-protocols-policy-guidance.pdf

25. The MPP program clearly deviates from the credible fear interview process, which requires officers to ask individuals who cross the border whether they have a fear of return, by providing asylum interviews at the border to only those individuals who affirmatively express a fear of returning.[3]

26. The DHS implements the MPP program and expels asylum seekers to Mexico even though they know that there is a high likelihood that they will be persecuted or tortured while they stay there.

27. The goal of the MPP program is simple: bar entry of Central and South Americans into the United States and force them to wait in dangerous conditions where their main focus is daily survival, to reduce the number of people who want to seek asylum and protection in the United States.

28. The MPP program is clearly contrary to the immigration laws of the United States, which protect individuals who are fleeing persecution by offering them the opportunity to seek asylum in immigration court proceedings while remaining in the country.

## V.  FACTS

29. Matamoros is part of the Mexican state of Tamaulipas, for which a Level 4

---

[3] DHS, *Assessment of the Migrant Protection Protocols (MPP), Appendix A: Additional Analysis of MPP Fear-Assessment Protocol* (Oct. 28, 2019), www.dhs.gov/sites/default/files/publications/assessment_of_the_migrant_protection_protocols_mpp.pdf.

travel warning has been issued by the U.S. Department of State ("DOS"), meaning that individuals *should not* travel there.[4]

30. Per the DOS' own warnings, Tamaulipas is home to numerous criminal groups, such as the Gulf Cartel and the Zetas, who are heavily armed and who patrol large areas of the state, often acting illegally without any repercussions from law enforcement.[5] The criminal activity in question includes gun battles, murder, armed robbery, carjacking, kidnapping, forced disappearances, extortion, and sexual assault.[6]

31. Additionally, U.S. government employees have been instructed that they can only travel to Tamaulipas if they travel in the limited areas between the U.S. consulates and ports of entry.[7] They are forbidden from using freeways to travel between cities in the state, and they are not permitted to travel at night.[8]

32. Given that the DOS has issued the aforementioned warnings, the DHS should be aware of the conditions in Matamoros, Mexico. Yet, it continues to expel asylum seekers, like Plaintiffs, there.

33. As of December 15, 2020, Human Rights First documented 1,314 incidents of

---

[4] https://travel.state.gov/content/travel/en/traveladvisories/traveladvisories/mexico-travel-advisory.html
[5] OSAC, *Mexico 2019 Crime and Safety Report: Matamoros* (Apr. 2, 2019), https://www.osac.gov/Content/Report/03b73ba8-0cd3-4772-bc97-15f4aebfc985
[6] *Id.*
[7] https://travel.state.gov/content/travel/en/traveladvisories/traveladvisories/mexico-travel-advisory.html
[8] *Id.*

murder, rape, kidnapping, torture, and assault committed against migrants placed in the MPP. *See* Exhibit 18—Human Right First Report 2020. Yet, the report cautions that the actual count is likely much higher as "the overwhelming majority of returned people have not spoken with human rights investigators or journalists" and COVID-19-related restrictions have further limited reporting. *Id*. Of the reported attacks, 318 were kidnappings or attempted kidnappings of children. *Id*.

34. LGBT asylum seekers face even more likelihood of harm, with two-thirds reportedly suffering sexual and gender-based violence. *See* Exhibit 19— Congressional Follow Up Letter on Inquiry into Placement of LGBT Migrant in MPP; Exhibit 20—Letter from AILA, AIC, HRF, TCRP to Chad Wolf

**Facts for Plaintiffs K.P.P.R. and A.J.V.P**

35. K.P.P.R. and her son, A.J.V.P., are natives and citizens of Honduras. *See* Exhibit 1—Sworn Declaration of K.P.P.R. K.P.P.R. and her husband were police officers in Honduras. *Id*. They were targeted for this reason and her husband was murdered. *Id.* K.P.P.R. initially fled Honduras and went to Mexico in July of 2019 with her child because she feared for her life and the life of her son. *Id*. However, they could not get legal documents in Mexico and so they were deported back to Honduras. *Id*.

36. After approximately two weeks in Honduras, K.P.P.R. and her son fled

Honduras and again went to Mexico because K.P.P.R. feared that she would be killed if she remained in Honduras. *Id*.

37. While in Mexico, a woman arranged for people to transport K.P.P.R. and her son to the United States. *Id*. However, the people who were responsible for transporting K.P.P.R. and her son kidnapped them and held them for ransom in the amount of $3,000. *Id*. They told K.P.P.R. and her son that they would kill them if they did not pay the ransom. *Id*.

38. K.P.P.R. and her son were held for approximately ten days. *Id*. While detained, they were moved from place to place. *Id*. They were held in rooms with guards watching them, and they were only given one meal per day. *Id*. K.P.P.R. had to even sacrifice her meal, so that her son could eat because he could not survive on one meal per day. *Id*.

39. K.P.P.R.'s family were able to pay the ransom, and she and her son were released by the kidnappers and allowed to come to the United States. *Id*.

40. On September 1, 2019, K.P.P.R. and her son entered the United States without being inspected and admitted. *Id*.; *see also* Exhibit 2—Form I-213 for K.P.P.R. Shortly after their entry, they were apprehended by immigration officials and were told that they were subject to the MPP program and that they had to remain in Matamoros, Mexico for the duration of their removal proceedings. *Id*.

41. The first night in Matamoros, K.P.P.R. and her son slept outside of the Mexican

10

immigration office. *See* Exhibit 1, *supra*. They then stayed outside of a woman's house for a few nights, and then spent one night at a shelter. *Id*.

42. K.P.P.R. was able to communicate with an aunt in Nuevo Laredo, who told her that she and her son could stay with them for approximately six weeks. *Id*. However, the aunt mistreated K.P.P.R. and her son, even forcing them to sleep outside of the house. *Id*. In the end, K.P.P.R. had to return to Matamoros. *Id*.

43. After returning to Matamoros, a woman allowed K.P.P.R. and her son to stay with her and her husband. *Id*. Unfortunately, the husband began to mistreat K.P.P.R. by trying to force her to be intimate with him, touching her inappropriately, and bullying her. *Id*. So, K.P.P.R. and her son were forced to move to the plaza in Matamoros at the foot of the Gateway International Bridge, and live in a small tent. *Id*.

44. Around late 2019 and the beginning of 2020, the migrant camp was set up and K.P.P.R. and her son were given a tent to sleep in. *Id*. They have now lived in the camp for approximately one year. *Id*.

45. While in the camp, K.P.P.R. and her son have been subjected to extremely dangerous conditions. *Id*. Dead bodies wash up in the river, dangerous criminal groups have infiltrated the camp, and people from the camp disappear and are never seen again. *Id*.

46. K.P.P.R. cannot work at this time because no one is able to care for her son. *Id*.

Therefore, she cannot support herself and her son. *Id*.

47. Her son, A.J.V.P. is also struggling. *Id*. He does not eat, struggles to fall asleep, and sometimes refuses to wake up until late in the afternoon. *Id*.

48. K.P.P.R. and her son cannot remain in the camp, where they are living now, any longer while waiting for their next immigration court hearing. *Id*. Their hearings have been postponed at least six times. *Id.* Last time their hearing was reset from December 21, 2020 to March 8, 2021. *Id.* However, it is likely to be postponed again due to the indefinite suspension of MPP hearings based on COVID-19,[9] which means K.P.P.R. and her child will be forced to remain in the tent camp for an unknown period of time. *Id*. For that reason, K.P.P.R. and her son should be permitted to enter the United States and live with their family members, where they will pursue their asylum cases in safety. *Id*; *see also* Exhibit 3—Photos of Living Conditions at Camp. Therefore, they are filing the present Complaint, requesting the Court to grant them declaratory and injunctive relief.

### Facts for Plaintiffs A.C.C.C. and A.C.C.C.

49. A.C.C.C. is a native and citizen of El Salvador. *See* Exhibit 4—Sworn Declaration of A.C.C.C. She fled El Salvador on August 4, 2019 with her daughter A.C. because gang members attempted to rape A.C. and physically

---

[9] https://www.justice.gov/opa/pr/department-justice-and-department-homeland-security-announce-plan-restart-mpp-hearings

assaulted her on multiple occasions. *Id*.

50. A.C.C.C. entered the United States with her daughter on September 4, 2019, without being inspected and admitted or paroled. *Id*; *see also* Exhibit 5—Form I-213 for A.C.C.C. They were apprehended by immigration officials, placed in the MPP program, and forced to remain in Mexico for the duration of their immigration proceedings. *Id*.

51. Prior to entering the United States, A.C. had a bad fall, which resulted in deep cuts to the back of her legs. *See* Exhibit 5, *supra*. She could barely walk after the fall. *Id*. She was transferred to a hospital for further treatment after entry into the United States and separated from A.C.C.C. *Id*.

52. While A.C.C.C. and A.C. were separated, they were interviewed by an immigration officer. *Id*. A.C.C.C. explained to the officer that they came to the United States to seek protection from harm and that they were seeking asylum. *Id*. She further explained that her daughter was in critical condition and it would be dangerous for them to remain in Mexico. *Id*. The officer responded that he was just following instructions. *Id*.[10]

53. A.C.C.C. and her daughter were taken to the Gateway International Bridge,

---

[10] A.C.'s physical and mental impairments should have exempted her from placement in MPP. *See* Customs and Border Protection, "MPP Guiding Principles," Jan. 29, 2019, https://www.cbp.gov/sites/default/files/assets/documents/2019-Jan/MPP%20Guiding%20Principles%201-28-19.pdf

were released into the custody of Mexican authorities who provided them with documents, and were then let go. *Id*. They were not explained what those documents meant. *Id*.

54. The night that A.C.C.C. and her daughter were released, they were both forced to sleep on the street outside of a building. *Id*. They slept on the street for two nights until someone from a church assisted them. *Id*.

55. A.C.C.C. maintains that she and her daughter are not safe in Mexico. *Id*. Men recognize them as foreign and not from Mexico and call them "sluts" and other types of degrading names. *Id*. On one occasion, a man grabbed A.C. by the leg and attempted to assault her. *Id*. While A.C.C.C. was attempting to defend her daughter, she was punched in the right arm. *Id*.

56. According to A.C.C.C., before being placed in the MPP, A.C. showed symptoms of depression, but her symptoms have worsened after being returned to Mexico under the MPP. A.C. is currently suffering from severe depression and has made several suicide attempts. *Id*. As A.C.C.C. notes, she had to be withdrawn from school, she has stopped eating, and has tried to kill herself on multiple occasions, once by trying to hang herself and other times by running into traffic. *Id*.

57. A.C.C.C. attempted to get professional help for her daughter, but the Mexican government and other psychologists were not able to assist her. *Id*. So, in December of 2019, A.C.C.C. and her daughter entered the United States again

and A.C.C.C. begged immigration officials for assistance. *Id*. They were once again detained and separated. *Id*. While separated, A.C. attempted to kill herself in the detention center with an aluminum blanket. *Id*. A.C. was then transferred to the hospital, while A.C.C.C. remained detained. *Id*.

58. After approximately six days, A.C. was released from the hospital. *Id*. She was prescribed medication to treat her depression. *Id*. She was then reunited with A.C.C.C. at the detention center, but after three nights there, they were informed that they were going to be returned to Mexico once again. *Id*.

59. A.C.C.C. begged border officials to let A.C. remain in the United States because she was in critical condition. *Id*. However, officials ignored her request and they were sent back to Mexico. *Id*.

60. A.C.C.C and A.C.'s next immigration court hearing has been rescheduled three times and her next hearing is set for March 31, 2021 at 1:00 P.M. *Id*. The delay of court proceedings has been extremely difficult for A.C.C.C. and her daughter. *Id*. A.C.'s mental condition continues to deteriorate. *Id*. The area in Matamoros where they live is controlled by criminal groups, which forces them to stay in an apartment without leaving it, unless it is absolutely necessary. *Id*. Therefore, to be safe and pursue their asylum claims without fear, A.C.C.C. and her daughter need to be in the United States with their family. *Id*.

## Facts for Plaintiffs R.C.A.P., J.R.A.M., and R.C.A.M.

61. R.C.A.P. and his children J.R.A.M., and R.C.A.M. are natives and citizens of El Salvador. *See* Exhibit 6—Sworn Declaration of R.C.A.P. They fled their country to seek protection in the United States. *Id*.

62. R.C.A.P. fled with his children because the Mara Salvatrucha ("MS") gang came looking for R.C.A.P. after he testified against an MS gang member for murdering one of R.C.A.P.'s colleagues, and also because the 18th Street Gang threatened to kill him and his family when R.C.A.P. refused to inform the gang where the police were located in the community. *Id*.

63. R.C.A.P. and his children entered the United States without inspection on August 14, 2019. *See* Exhibit 7—Form I-213 for R.C.A.P. They were apprehended shortly thereafter by U.S. Border Patrol Agents. *See* Exhibit 8, *supra*.

64. After R.C.A.P. and his children were apprehended, they were taken to the border patrol station. *Id*. They were then taken by bus to the "icebox." *Id*. They were there for approximately two weeks. *Id*.

65. One morning, officers came to R.C.A.P. and his children's cell and informed them that they were going back to Mexico and that they would have to remain there for the duration of their court proceedings pursuant to the MPP program. *Id*.; *see also* Exhibit 7, *supra*.

66. R.C.A.P. and his children were taken to Mexico by U.S. officials and transferred to the Mexican immigration agency. *See* Exhibit 6, *supra*. They were told that they would be transferred to a shelter but they were not and had to sleep outside of the immigration agency on the ground. *Id*.

67. While in Mexico, R.C.A.P. and his sons have been forced to live in a camp along the river. *Id*. Because of the snakes and other animals along the river, R.C.A.P. and his sons are in danger of getting bitten. *Id*. They are also in danger of getting hurt from slipping and falling in the mud when it rains. *Id*.

68. R.C.A.P. and his sons sleep in a tent at the camp. *Id*. They prepare their food over a fire outside of it. *Id*. The camp has portable toilets, but it does not have running water. *Id*. The toilets are also very dirty, and are often closed down because they overflow with human waste. *Id*. R.C.A.P. is afraid both he and his sons will catch a disease because of these conditions. *Id*.

69. There are other dangerous conditions in the camp. *Id*. Criminal groups control the area where R.C.A.P. and his children live. *Id*. There are people who have drowned in the river and there are dead bodies. *Id*. There have even been shootouts between criminal groups and the military near the camp, causing R.C.A.P. and his sons to flee and hide in their tents. *Id*.

70. R.C.A.P.'s children have not been able to get a proper education since being in the camp. *Id*. The most that they get now is forty-five minutes of instruction from

17

a Cuban teacher over video. *Id*. Prior to that, R.C.A.P. had to teach his children himself. *Id*.

71. R.C.A.P.'s children have suffered severe emotional distress at the camp. *Id*. They wake up suddenly at night after having nightmares. *Id*. They get terrified and begin shaking, and R.C.A.P. has to hug them until they fall asleep. *Id*.

72. Because of the medically and scientifically unjustified[11] bar on processing of asylum-seekers, and indefinite postponement of MPP hearings,[12] R.C.A.P. and his children's hearings have been reset multiple times. *Id*. As of the date of filing this Complaint, R.C.A.P.'s and his children's hearings have been postponed to March 16, 2021. For that reason, R.C.A.P. and his children need to come to the United States to be with their family until their court proceedings culminate, so as to pursue their claims in safety. *Id*.

### Facts for Plaintiffs J.S.S.S. and R.R.S.

73. J.S.S.S. and R.R.S. are an indigenous mother and daughter who are natives and citizens of Guatemala. *See* Exhibit 8—Sworn Declaration of J.S.S.S. They fled Guatemala because they suffered persecution there, and are currently seeking asylum in U.S. immigration court. *Id*.; *see also* Exhibit 9—Form I-213 for

---

[11] https://www.justsecurity.org/69747/there-is-no-public-health-rationale-for-a-categorical-ban-on-asylum-seekers/

[12] https://www.rollcall.com/2020/05/20/asylum-seekers-could-remain-in-mexico-for-years-amid-pandemic/

J.S.S.S.

74. J.S.S.S. fled Guatemala with her daughter because J.S.S.S. was raped by three men while R.R.S. was watching. *See* Exhibit 8, *supra*. She reported the incident to the Public Ministry, but they were unable to assist her because they did not speak her indigenous language. *Id*. Therefore, she had no choice but to flee to the United States with her daughter. *Id*.

75. On August 10, 2019, J.S.S.S. and her daughter entered the United States without inspection. *See* Exhibit 8, *supra*. They were encountered by immigration officials shortly thereafter and were apprehended. *Id*. They were taken to another area where they had to stay overnight and sleep on the street. *Id*.

76. The day after they were apprehended, J.S.S.S. and her daughter were taken to the "icebox." *Id*. After three days, they were taken to another "icebox" and detained for another two days there. *Id*. In the second "icebox," the conditions were very poor. *Id*. It was very crowded, with no space to move or sleep, and no privacy when using the restroom. *Id*.

77. J.S.S.S. and her daughter did not have blankets in the "icebox."[13] *Id*. J.S.S.S. also had a difficult time changing her daughter's diapers, and the officers yelled at her, accusing her of using too many diapers. *Id*.

---

[13] J.S.S.S. and her daughter did have nylon blankets at some point, but they lost them. *See* Exhibit 8, *supra*.

78. After two days in the second "icebox," J.S.S.S. and her daughter were taken by bus to the international bridge in Brownsville, Texas. *Id*. J.S.S.S. was given documents telling her that they had a court hearing date and that they had to return to Mexico to wait for that hearing.[14] *Id*. J.S.S.S. did not understand what was happening because of her limited knowledge of Spanish. *Id*. When they were returned to Mexico, they were provided with a permit by Mexican officials to remain in Mexico. *Id*.

79. Since being in Mexico, J.S.S.S. has had many problems. *Id*. She speaks the indigenous language Chalchiteco, and minimal Spanish, so whenever she talks, she is insulted. *Id*. People yell and threaten to hit her if she does not speak Spanish. *Id*. One time, a woman yelled at J.S.S.S. and shoved her because she is indigenous. *Id*. She is simply not accepted in Mexico. *Id*.

80. J.S.S.S. maintains that the situation in Mexico is very dangerous. *Id*. Until recently, J.S.S.S. and her daughter were living in a tent at a camp near the international bridge in Matamoros. *Id*. They had to bathe and wash their clothes in the river, which is dangerous because "there are bad people there." *Id*.

81. The weather has also been very difficult to deal with. *Id*. During a hurricane, water entered J.S.S.S. and her daughter's tent, terrifying R.R.S. *Id*. A few days

---

[14] J.S.S.S. should not have been subject to MPP because she is an indigenous-language speaker, according to guidance from DHS. *See* Exhibit 20, *supra*.

later, the river began flooding, forcing J.S.S.S. and her daughter to leave the camp. *Id*.

82. After leaving the tent camp, J.S.S.S. and her daughter began renting a room in a house nearby. *Id*. It is difficult for them to get food or medicine because those are expensive for J.S.S.S. *Id*. According to a medic at the camp, this is problematic for R.R.S. because she is underweight and needs to eat more. *Id*.

83. J.S.S.S. was given some milk and vitamins for her daughter, but R.R.S. is not drinking the milk, so J.S.S.S. is worried about her health and that she will not get better without more medical help. *Id*.

84. J.S.S.S. and her daughter's hearing was initially set for October 21, 2019. *Id*. However, the hearing was cancelled and rescheduled. *Id*. J.S.S.S. and her daughter's hearings have been cancelled and rescheduled multiple times due to the closures of the MPP courts. *Id*. At this point, it is unclear when J.S.S.S. and her daughter's final hearing will take place, forcing them to remain in Mexico, in dangerous conditions, until further notice. For that reason, J.S.S.S. and her child should be allowed to enter the United States, where they will be able to pursue their asylum cases in safety

**Facts for Plaintiffs J.M.A. and K.J.P.M.**

85. J.M.A. and her daughter K.J.P.M. are indigenous natives and citizens of Guatemala. *See* Exhibit 10—Sworn Declaration of J.M.A. They fled Guatemala

because J.M.A. was beaten and raped by a group of men in front of her daughter, and J.M.A. was told that if she reported the incident to the police, they would kill her. *Id*.

86. On August 10, 2019, J.M.A. and her daughter entered the United States without inspection. *See* Exhibit 11—Form I-213 for J.M.A. They turned themselves over to immigration officials and were detained for a period of four days. *See* Exhibits 10-11, *supra*. Despite noting on the I-213 that J.M.A. was not amenable to placement in MPP due to her status as a non-Spanish speaker, the agency nevertheless placed her and her daughter in MPP.[15] *See* Exhibit 10, *supra*.

87. The place where J.M.A. and her daughter were detained in the U.S. after turning themselves in to immigration officials in the U.S. was extremely cold and dirty. *See* Exhibit 11, *supra*. The officers only gave them both one blanket to cover themselves and stay warm. *Id*.

88. After four days in detention, J.M.A. and her daughter were sent back to Mexico. *Id*. J.M.A. tried telling the officers that she was afraid to return to Mexico, but they did not understand because J.M.A. speaks very little Spanish. *Id*.

89. Immigration officers put J.M.A. and her daughter on a bus that dropped them off at the tent camp in Matamoros, Mexico. *Id*. Eventually, J.M.A. was able secure

---

[15] J.M.A. should not have been subject to MPP because she is an indigenous-language speaker, according to guidance from DHS. *See* Exhibit 20, *supra*.

a tent for herself and her daughter. *Id*. At present, they still live in the camp. *Id*.

90. J.M.A. states that living in the camp has been extremely difficult for them. *Id*. At times, J.M.A. struggles to obtain sufficient food for her and K.J.P.M. During intense storms, J.M.A. has feared their tent would collapse or be swept away. The rain brings many insects, including snakes, and rats to the camp. *Id*. K.J.P.M. has insect bites all over her body. *Id*.

91. K.J.P.M. does not eat or play. *Id*. She seems very sad, and her development has been impacted because she has not been able to get an education, which depresses J.M.A. *Id*. J.M.A. feels that as each day passes, her strength to keep moving forward diminishes further. *Id*.

92. As noted above, J.M.A. does not speak Spanish. She speaks the indigenous language Chalchiteco. *Id*. She suffers frequent discrimination in Mexico based on her ethnicity and difficulty speaking Spanish. For example, she has been yelled at and threatened. *Id*. Local Mexican people insult her and call her names. *Id*. People ridicule her for making mistakes while attempting to communicate in Spanish. *Id*.  One time, J.M.A. tried to take her daughter to the park, and when a man heard her speaking her native language, he yelled at her. *Id*. He told her that she needed to leave Mexico and go back to her country.  *Id*. These incidents have caused J.M.A. to stop speaking to people and forced her to isolate herself to prevent having further problems. *Id*.

93. J.M.A. and her daughter live in fear in Matamoros. *Id*. The corpses of dead migrants appear in the river. *Id*. J.M.A. even knew a Guatemalan migrant found dead in the river. *Id.* She describes him as a good person. *Id.* *Id*. J.M.A. does not want to live in these conditions with her daughter. *Id.*

94. J.M.A. and her daughter's immigration court hearings have continuosly been reset, first because the court failed to provide a Chalchiteco interpreter, then because of the indefinite postment of MPP hearings. The first four times J.M.A. went to court, she was returned to Mexico because the court could not locate an interpreter who spoke Chalchiteco. *Id*. In February of 2020, the court finally found an interpreter, but he did not speak the language well. *Id*. Since then, J.M.A. and her daughter's hearings have been rescheduled because the courts are closed. *Id*. Their next hearing is set for March 11, 2021, but it is likely that the hearing will be rescheduled, yet again. *Id*. As such, it is unclear how long J.M.A. and her daughter will be forced to remain in Matamoros under dangerous and inhumane conditions. *Id*. Therefore, they should be brought back to the United States to be with their family members in order to pursue their asylum claims in safety. *Id*.

**Facts for Plaintiffs E.M.C., A.B.C.C., O.D.C.C., and C.J.C.C.**

95. E.M.C., and her children, A.B.C.C., O.D.C.C., and C.J.C.C. are natives and citizens of El Salvador. *See* Exhibit 12—Sworn Declaration of E.M.C. They fled

El Salvador because MS-13 gang members threatened to kill them if they did not leave. *Id*. MS-13 also threatened to kill them if A.B.C.C. refused to join their gang upon turning thirteen years old. *Id*.

96. E.M.C.'s husband, C.I.C.G., and her oldest son, W.I.C.C., fled El Salvador in 2017. *Id*. They were not subject to the MPP and currently live in Virginia while their removal proceedings are pending, along with E.M.C.'s mother who has TPS status. *Id*. E.M.C. and her children, however, were not so fortunate. *Id*.

97. E.M.C. and her children crossed the U.S.-Mexico border through the river and entered the United States on or about August 14, 2019 without inspection. *Id*.; *see also* Exhibit 13—Form I-213 for E.M.C. They walked for approximately twenty-four hours after crossing before encountering border patrol agents and asking them for help. *Id*.

98. The border patrol agents told E.M.C. that they had to get rid of their belongings, and they were then placed on a bus and taken to a facility called "perrera" ("dog pound"). *See* Exhibit 12, *supra*. They were kept in cages separated by a chain-link fence. *Id*.

99. The facility where E.M.C. and her children were being detained was very crowded. *Id*. A.B.C.C., twelve years old at the time, was separated from E.M.C., O.D.C.C., and C.J.C.C, and placed in a separate cage. E.M.C.'s youngest child, C.J.C.C. was not fully potty trained at the time, and so still needed to wear

diapers. *Id*. When E.M.C. asked the guards for those diapers, the guards belittled C.J.C.C. and refused to provide diapers, claiming at almost three, he was too old. *Id*. So, to preserve the single unused diaper in her possession, she cleaned the dirty diaper with her hands and water. *Id*. She was too afraid to ask for more diapers. *Id*.

100.   E.M.C. and her children were in the "dog pound" for approximately two nights. *Id*. Prior to being released, they were informed that they could not live with their family in Virginia during their immigration proceedings, and and that instead, they had to remain in Mexico pursuant to the MPP program. *Id*.; *see also* Exhibit 13, *supra*.

101.   E.M.C. and her children were released from the "dog pound" and were taken to the "hielera" ("icebox"). *See* Exhibit 12, *supra*. A.B.C.C. was once again separated from E.M.C. and her other children and taken to a crowded room with other males, who looked like adults. *Id*. He was given an aluminum foil blanket and cried often. *Id*. While at the "hielera," E.M.C. had no in-person contact with A.B.C.C., and could only wave to him through the glass that separated them. *Id*.

102.   E.M.C. and her other sons were kept in another crowded room with approximately one hundred other people. *Id*. So many people made it difficult to move around, and officials kept the room freezing. *Id*. They had aluminum blankets as well, but the blankets failed to adequately fight the cold. *Id*.

Additionally, the lights were kept on all night and there was only one toilet without any doors or curtains, so there was no privacy. *Id*.

103.  After one or two nights, E.M.C. and her children were sent to Matamoros. *Id*. When they got there, they had nowhere to go, so for three weeks they used discarded pizza boxes to create a place to sleep in the plaza by the international bridge. *Id*.

104.  Eventually, E.M.C.'s husband was able to send her money so that she could buy a tent to stay in with her children. *Id*. E.M.C. does not have a passport, and since the beginning, she cannot receive money directly from her husband. *Id*. As a result, her husband must send money to another person with a passport, and then E.M.C. picks up the money from that person. *Id*.

105.  While living in the tent at the plaza, E.M.C. and her children suffered greatly. *Id*. C.J.C.C. became sick and had diarrhea for over a week, had frequent colds, and caught chickenpox which turned into rashes and blisters. *Id*. Because of this, E.M.C. knew that she had to find a way to leave the plaza and live somewhere else. *Id*.

106.  E.M.C.'s brother in El Salvador made contact with a man named Felix, who her brother knew from childhood. *Id*. Felix and his wife Nancy live in Matamoros and E.M.C. and her sons moved in with them in mid-November of 2019. *Id*.

107.  E.M.C. states that at first, Felix and his wife were nice to them. *Id*. However, after about two weeks things changed. *Id*.

108.  When E.M.C.'s husband sent money to Felix for E.M.C., Felix would keep most of it and only give E.M.C. a small amount. *Id*. After a while, Felix and his wife refused to let E.M.C. and her sons to leave their house, and ordered E.M.C. to ask her husband for additional money.. *Id*.

109.  Felix and his wife began threatening E.M.C. and her children. *Id*. Felix told E.M.C. that they had friends in criminal organizations, and if they tried to leave, he would call them and they would take E.M.C. and her children away. *Id*. Felix also warned that if she told her husband about their imprisonment in the home and that Felix kept the money, Felix would tell her husband that she was cheating on him with other men. *Id*. They also verbally abused E.M.C.'s sons. *Id.*

110.  One night, Felix attempted to rape E.M.C. *Id*. Thankfully, his wife came home and interrupted his attempt. *Id*.

111.  When E.M.C. and her children had an immigration hearing, Felix accompanied them to the plaza, and waited for them to return.  *Id*. As E.M.C. notes, Felix did that because he did not want them to escape his reach. *Id*.

112.  At a hearing on March 2020, E.M.C. expressed to the immigration judge that she was afraid to go back to Mexico. *Id*. The judge told her that she could have an interview about her fear of returning to Mexico. *Id*.

113.   At the non-refoulment interview, E.M.C. informed the officer of the mistreatment she and her children were suffering at the hands of Felix and his wife in Matamoros. *Id.* However, on March 5, 2020, the asylum officer determined that E.M.C. did not have a clear probability of persecution or torture in Mexico. *See* Exhibit 13, *supra*. E.M.C. and her children were then forced to return to Mexico. *See* Exhibit 12, *supra*.

114.   One day at Felix's house, E.M.C. was sitting by a half-broken window when a lady named Elena approached her. *Id.* They talked for a short time. *Id.* Elena approached E.M.C. a second time and asked her why she was always at the window. *Id.* E.M.C. explained to her what was happening with Felix and she asked for Elena's help. *Id.* Elena agreed and they set up a time for E.M.C. and her sons to escape Felix's house at night. *Id.*

115.   E.M.C. and her children escaped through the half-broken window and Elena took them to her house. *Id.* They stayed with Elena for a few days, after which Elena found E.M.C. and her children a room to rent from a woman Elena knew. *Id.* E.M.C. and her children do not want to leave the room because they are afraid of Felix and his wife. *Id.*

116.   A.B.C.C. and O.D.C.C. have not attended school for over a year, and so they are not getting an education. *Id.* A.B.C.C. has grown depressed and sometimes expresses suicidal thoughts. *Id.*

117.   E.M.C. and her children's hearings have been postponed four times already. *Id*. Each time the hearing is delayed, E.M.C. becomes more depressed and hopeless. *Id*. Their next hearing is set for February 9, 2021, but due to the indefinite postponement of MPP hearings, it is unclear if that hearing will even take place. If it gets postponed again, E.M.C. and her children will be stuck in Mexico for the foreseeable future. For that reason, E.M.C. and her children should be permitted to enter the United States, so as to be able to go forward with their asylum cases in safety.

### Facts for Plaintiffs D.C.M.V. and G.J.M.V.

118.   D.C.M.V. is a national and citizen of El Salvador. *See* Exhibit 14—Sworn Declaration of D.C.M.V. Her daughter, G.J.M.V., is a native and citizen of Mexico, as she was born there after D.C.M.V. fled El Salvador. *Id*.

119.   D.C.M.V. fled El Salvador on February 17, 2019 to escape rape, abduction, and sexual slavery at the hands of an MS-13 gang member. *Id*.

120.   D.C.M.V. traveled through Mexico prior to entering the United States. *Id*. In January of 2020, while traveling by bus to the U.S. border to seek asylum, D.C.M.V. and her partner, J.D.P.Z., were abducted by four armed cartel members in Nuevo Laredo. *Id*. They were blindfolded and taken to a ranch. *Id*. While there, J.D.P.Z. was tied to a chair, gagged, and forced to watch as the men gang-raped D.C.M.V. *Id*.

121.   During the rape, D.C.M.V. was slapped, beaten, insulted, and had a knife held to her neck, face, and belly. *Id*. D.C.M.V. was crying and screaming in pain. *Id*.

122.   D.C.M.V. did not tell the men raping her that she was pregnant because she feared that if she told them, they would stab or kick her stomach to cause a miscarriage. *Id*.

123.   After the rape, the men beat her partner some more. *Id*. They then dragged him out of the room and that was the last time D.C.M.V. saw her partner. *Id*.

124.   D.C.M.V. was locked in a room by herself for several days. *Id*. While in the room, she was raped and beaten several more times. *Id*. Thankfully, after a few days in captivity, D.C.M.V. managed to escape. *Id*.

125.   D.C.M.V. entered the United States around February 28, 2020 near Carrizo Springs, Texas without inspection after crossing the river. *Id*. She got lost and spent the night hidden in the brush. *Id*. She then turned herself over to immigration officials the next morning. *Id*.

126.   D.C.M.V. told immigration officials that she was pregnant, had bad pains in her stomach, and that she was bleeding from her vagina. *Id*. She was then taken to the hospital in Carrizo Springs. *Id*.

127.   D.C.M.V. remained at the hospital for about two or three days. *Id*. She was told that she had suffered physical damage to her vagina from the sexual assaults.

*Id*. The healthcare providers prescribed her medication and then released her.[16]

*Id*. She was then taken to the "hielara," where she remained for approximately

four days. *Id*.

128.   Next, D.C.M.V. was sent to a separate office in Laredo, Texas. *Id*. At the

office, immigration officials informed D.C.M.V. that they were placing her in

the MPP program and that she had to remain in Nuevo Laredo, Mexico, for the

duration of her immigration court proceedings. *Id*.

129.   Once D.C.M.V. was told she had to go back to Mexico, she began having

flashbacks of her captivity and the sexual abuse she suffered. *Id*. Her body froze

and she started to shake. *Id*. She pleaded with the officers not to send her to

Nuevo Laredo because of the multiple rapes she suffered, and the violence that

migrants faced in Mexico. *Id*.

130.   D.C.M.V. was not given any type of non-refoulement interview by an asylum

officer while detained, even though she expressed a fear of returning to Mexico.

*Id*. She was simply returned to Mexico and forced to remain there. *Id*.

131.   While in Mexico, D.C.M.V. has become depressed, traumatized, and

constantly fearful of the health and safety of both herself and her baby. *Id*. She

---

[16] D.C.M.V.'s medical state and pregnancy should have exempted her from MPP as a member of a vulnerable population, assuming arguendo she was ever properly subject the program. *See* Customs and Border Protection, "MPP Guiding Principles," Jan. 29, 2019, https://www.cbp.gov/sites/default/files/assets/documents/2019-Jan/MPP%20Guiding%20Principles%201-28-19.pdf.

has trouble sleeping and has nightmares because she relives the pain of the kidnapping and gang rapes she suffered. *Id*.

132.  Receiving medical care has also been very difficult in Mexico. *Id*. When D.C.M.V. was five months pregnant, she felt terrible cramps in her stomach. *Id*. She though that she was going into labor. *Id*. She panicked but managed to walk thirty minutes to a nearby hospital. *Id*. Unfortunately, the hospital staff informed her that they could not treat her because she did not have medical insurance. *Id*. She begged them for help, but they refused to help her. *Id*.

133.  When D.C.M.V. was six months pregnant, she began bleeding from her vagina. *Id*. Fearing that she would have a miscarriage, she walked to another public hospital. *Id*. When she got there, the employee guarding the door refused to let her in, as the hospital was not allowing people in due to COVID-19. *Id*. She begged for help and was asked for identification and documents. *Id*. She provided her MPP paperwork, but the employee told her that because she was a migrant, the hospital would not help her. *Id*.

134.  In June of 2020, D.C.M.V., with the assistance of an attorney, filed a parole request to enter the United States based on urgent humanitarian reasons. *Id*. However, the request was denied. *Id*.

135.  On August 9, 2020, D.C.M.V.'s daughter was born in Piedras Negras, Mexico. *Id*. Prior to the delivery, D.C.M.V. had a lot of bleeding. *Id*. She went

to the hospital again, but the hospital refused to provide medical care and she waited as her bleeding grew worse. *Id.* Eventually, a nurse took pity on her and admitted her. *Id.* Finally, she went into labor and gave birth to her child. *Id.* However, literally a few hours after giving birth, D.C.M.V. and her child were rushed out of the hospital and discharged. *Id.*

136.    D.C.M.V. has struggled to provide for herself and her daughter. *Id.* It has been extremely difficult to find a job because D.C.M.V. is not Mexican and is a migrant. *Id.* For one job that she found, working as a waitress, D.C.M.V. only earned $50 Mexican pesos per day, approximately $2.50 U.S. dollars. *Id.*

137.    In addition to economic difficulties, D.C.M.V. has also been threatened and taken advantage of because she is not Mexican. On one occasion, a Mexican woman approached D.C.M.V. and told her that she had to give her money, and that if D.C.M.V. refused, the woman's husband, a Mexican immigration official, would deport D.C.M.V. *Id.* If deported, she would be separated from her daughter because her daughter is a Mexican national. *Id.* She was so afraid that she reported the threats to the police in Piedras Negras, but the police refused protection, simply telling her that she should move and if the threats get worse, they would do something. *Id.*

138.    It is extremely difficult and dangerous for D.C.M.V. and her daughter to travel to the border for her hearings. *Id.* She does not have a car, and does not know

anyone who can take her for her hearings. *Id.* She has to arrive at the port of entry at 4:30 A.M. on the day of her hearings. *Id*. She also lacks the money to travel. *Id*. She can barely afford to pay for housing, food, and her daughter's needs. *Id*.

139.    After their MPP hearings in Laredo, Texas, when migrants are sent back to Mexico,  they must cross the international bridge where the cartels wait to kidnap them. *Id*. It is extremely dangerous to travel to and from the hearings, especially when traveling at night. *Id*.

140.    D.C.M.V.'s court hearings have been postponed twice already. *Id*. Her next hearing is set for January 27, 2021. *Id*. However, it is unclear whether the hearing will go on as planned or whether it will get postponed again to a later date. *Id*. So, at this time, it is unkown when D.C.M.V. will actually have her next hearing. *Id*. She will have to remain in Mexico for an indefinite time in dangerous conditions, all the while reliving the horrific events that she has already suffered. *Id*. Therefore, she needs to be allowed to come into and remain in the United States with her family and be able to pursue her asylum case in safety. *Id*.

**Facts for Plaintiffs Y.A.C.B. and D.J.U.V.**

141.    Y.A.C.B. and her partner, D.J.U.V., are natives and citizens of Honduras. *See* Exhibit 15—Sworn Declaration of Y.A.C.B. They fled Honduras to seek protection in the United States because their family received death threats from

a gang, who previously killed Y.A.C.B.'s younger brother. *Id*.

142.   On October 24, 2019, Y.A.C.B. and D.J.U.V. entered the United States without inspection along with their twelve-year-old nephew I.N.C.C. *Id*. After crossing the river near Eagle Pass, Texas, they walked for about an hour and were apprehended and detained by U.S. immigration officials. *Id*.

143.   While in detention, Y.A.C.B., D.J.U.V., and I.N.C.C. were separated. *Id*. Y.A.C.B. and D.J.U.V. were later reunited and told that they had to leave the U.S. and return to and remain in Mexico until their next court hearing. *Id*.

144.   Y.A.C.B. told immigration officials that they were afraid to go to Mexico, but they told him that it was a Presidential order and they could not do anything to keep them in the United States. *Id*.

145.   Y.A.C.B. was extremely worried about I.N.C.C. *Id*. He asked an officer where he was and he was told that I.N.C.C. was going to be sent to a shelter in the United States. *Id*. He was asked about whether he had any family in the United States and he provided his sister's information to the officer. *Id*. The officer never told Y.A.C.B. that I.N.C.C. would be going to live with his sister, which I.N.C.C. eventually did. *Id*.

146.   Y.A.C.B. and D.J.U.V. were eventually moved to another detention center for a night, and then were walked to Nuevo Laredo by immigration officials, who transferred them to the Mexican immigration office. *Id*. The Mexican officials

gave them a permit to remain in Mexico while they were given a court hearing. *Id*. Importantly, the Mexican officials warned them that there were cartel members waiting around the corner and that everyone who leaves the office gets kidnapped. The officers warned that to avoid kidnapping, they should take a bus to Chiapas, Mexico, the southernmost state in Mexico and bordering Guatemala, thousands of miles from their next hearing. *Id*.

147.   Y.A.C.B. and his partner took the bus to Chiapas. *Id*. When they arrived, they were left on a random street corner and given no instructions or directions. *Id*. They had no phones and very little money. *Id*. They had to beg for money on the street from random people and managed to collect enough for bus fare to Mexico City. *Id*. From Mexico City, they returned to Nuevo Laredo and entered a shelter for migrants. *Id*.

148.   After their first hearing, on February 13, 2020, Y.A.C.B. and D.J.U.V. were riding with a pastor's assistant with other migrants when cartel members intercepted the vehicle and ordered them to get out. *Id*. The cartel members kidnapped one of the migrants but, thankfully, let Y.A.C.B. and D.J.U.V. go. *Id*.

149.   In the spring of 2020, cartel members began coming to the shelter where Y.A.C.B. and D.J.U.V. found refuge. *Id*. They entered every week or so, asked questions, and searched their phones to find out whether they had family members in the United States. *Id*. The cartel members kidnapped people directly

37

from the shelter if they had contacts in the U.S. *Id.* Y.A.C.B. and D.J.U.V. were extremely afraid when the cartel members would enter because they might be kidnapped. *Id*.

150.   After their June 11, 2020 hearing, Y.A.C.B. and D.J.U.V. were once again stopped by cartel members while in a vehicle with a pastor's assistant. *Id*. The cartel members ordered them out of the car and asked them questions. *Id*. Once again, Y.A.C.B. and D.J.U.V. were let go, but they decided to move to Monterrey to escape the violence and kidnappings in Nuevo Laredo. *Id*.

151.   D.J.U.V. is currently seven months pregnant. *Id*. Being in Mexico has been difficult and stressful for her. *Id*. When D.J.U.V. and Y.A.C.B. discuss going back to Nuevo Laredo for their next hearing, D.J.U.V. has panic attacks. *Id*.

152.   In July or August of 2020, D.J.U.V. experienced some abdominal bleeding. *Id*. She and Y.A.C.B. went to a local pharmacy and explained to the doctor there about her symptoms. *Id*. They were told that D.J.U.V. needed further testing and that she might have a miscarriage. *Id*.

153.   Y.A.C.B. and D.J.U.V. went to a clinic for further testing. *Id*. They told them that the baby's heart rate was very rapid and D.J.U.V. needed to see a gynecologist. *Id*. However, Y.A.C.B. and D.J.U.V. do not have medical insurance, which hospitals usually require before providing treatment. *Id*.

154.   D.J.U.V. plans to give birth at a public hospital, but because she does not have

insurance, she fears the hospital will refuse to admit her. *Id*. It would cost her 25,000 to 30,000 pesos to give birth at a private hospital. *Id*.

155.   In addition to the medical issues, Y.A.C.B. and D.J.U.V. maintain that they have not been and will not be protected by Mexican authorities while they remain in Mexico. *Id*. As Y.A.C.B. notes, D.J.U.V. was robbed by uniformed members of the Mexican federal police. *Id*. The police also discriminate against Y.A.C.B., regularly stopping Y.A.C.B. and searching him for drugs, informing him they do this because he is a migrant. *Id*. Y.A.C.B. has heard similar stories of police mistreatment towards other Honduran immigrants. *Id*.

156.   It is difficult for Y.A.C.B. and D.J.U.V. to find a job in Mexico. *Id*. Y.A.C.B. faces employment discrimination because he is a black indigenous migrant. *Id*.

157.   Many employers do not accept migrant workers, and if they do, they pay them less than Mexicans. *Id*. On one occasion, D.J.U.V. saw a sign for a job opening. *Id*. She managed to get an interview, but at the interview, she was asked where she was from. *Id*. She responded that she was from Honduras. *Id*. The employer then  offered her significantly less than the minimum wage to work nine hours a day from Monday through Sunday. *Id*. Currently, Y.A.C.B. works selling ice cream bars at stop lights. *Id*. People yell racial slurs at him and insult him for being a migrant. *Id*. They also avoid him when they see him because he is a black indigenous man. *Id*.

158.    Y.A.C.B. and D.J.U.V. have presented themselves at the bridge three times to date. *Id*. Their next hearing is set for March 30, 2021. *Id*. It is very difficult and stressful for Y.A.C.B. and D.J.U.V. to continue waiting for their hearings in Mexico given all that they have been through already. *Id*. It is even more difficult for them to present themselves for their hearings because of fear that they will be kidnapped, extorted, or even killed. *Id*. For that reason, Y.A.C.B. and D.J.U.V. need to enter the United States and remain here so that they can be reunited with their family and pursue their asylum in safety. *Id*.

### Facts for Plaintiff W.R.O.P.

159.    W.R.O.P. is a native and citizen of Nicaragua. *See* Exhibit 16—Sworn Declaration of W.R.O.P. He fled his country to seek protection in the United States because he was persecuted for his involvement in the "Blue and White" opposition group, and because he is a homosexual man. *Id*.

160.    Because of his political opinion and activities, the Nicaraguan police attempted to arrest and torture W.R.O.P. *Id*. He was also sexually and physically abused by his father and a family friend at a young age, and has faced persecution in the form of beatings, death threats, and attempted rape by his family members because of his sexual orientation. *Id*.

161.    In February 2020, W.R.O.P. entered the United States without inspection by crossing the river near Eagle Pass, Texas. *Id*. He walked north until immigration

officials apprehended him. *Id*.

162.   Officials detained W.R.O.P. at an immigration facility in Eagle Pass. *Id*. At the station, W.R.O.P. informed the immigration officer that he was gay and that he was afraid to return to Mexico. *Id*. W.R.O.P. was then placed in a room by himself and told that he was not going to be placed with other male migrants for his own safety. *Id*.

163.   While at the facility, W.R.O.P. overheard other migrants speaking of the MPP program and how it was extremely dangerous for migrants in Nuevo Laredo because of the cartels, who wait for migrants to cross the bridge to kidnap them and hold them for ransom. *Id*. W.R.O.P. prayed that he would not be placed in the MPP program and returned to Nuevo Laredo. *Id*. Unfortunately, the immigration officer informed W.R.O.P. that he would be returned to Mexico and forced to remain there pursuant to the MPP.[17] *Id*.

164.   W.R.O.P. and a group of migrants were driven to the bridge between Eagle Pass and Piedras Negras and were turned over to Mexican immigration officials. *Id*. They were all given paperwork informing them that they could live and work in Mexico while their case in U.S. immigration court proceeded. *Id*.

165.   Even though W.R.O.P. was given permission to work, it has been almost

---

[17] W.R.O.P. should not have been subject to the MPP program because of his status as a homosexual male, according to DHS's own guidance. *See* Exhibit 20—Letter from AILA, AIC, HRF, TCRP to Chad Wolf.

impossible for him to find work because of discrimination against migrants in Mexico. *Id*. As soon as an employer asks for documentation and sees that a job applicant is not from Mexico, the employer refuses to hire them. *Id*.

166.    W.R.O.P. has faced constant harm and violence in Mexico because he is a migrant, and especially because he is a gay migrant. *Id*. Approximately a week after arriving in Mexico, W.R.O.P. left his shelter in Chiapas one night and two male individuals accosted him and beat him severely. *Id*. He tried to defend himself but was outnumbered and overpowered. *Id*.

167.    As the men were kicking W.R.O.P., they shouted homosexual slurs at him and threatened to rape him with a stick. *Id*. One of the men, who had a knife, took it out and was about to stab W.R.O.P., but the other man insisted that they rape him with a stick. *Id*. The men began to undress W.R.O.P., but a woman nearby pleaded with the men to leave W.R.O.P. alone. *Id*. Her pleas attracted the attention of a group of people, resulting in the men stopping the beating and leaving W.R.O.P. alone. *Id*.

168.    The woman who pled for W.R.O.P.'s well-being allowed him to live with her for two weeks while he recovered. *Id*.

169.    After the beating W.R.O.P.'s eyes were very swollen, he had fevers, and trouble breathing, so he went to the doctor. *Id*. The doctor gave him medication and recommended getting a lung ultrasound to learn why he had problems

breathing. *Id*. W.R.O.P. could not afford the ultrasound and still has not gotten one to assess the lung damage. *Id*.

170.   On a different occasion, W.R.O.P. was threatened by a man in Piedras Negras. *Id*. W.R.O.P. was in line to buy some food when the man saw him and began hurling racial slurs at him. *Id*. W.R.O.P. let other people in line pass him to put some distance between himself and the other man. *Id*.

171.   Finally, W.R.O.P. was robbed by members of the Zetas cartel. *Id*. He was traveling from Monterrey to Eagle Pass by bus one day and cartel members boarded the bus. *Id*. They demanded to see identification and documents from people. *Id*. When the cartel members reached W.R.O.P., they interrogated him and W.R.O.P. feared they planned to kidnap him. *Id.*. *Id*. Ultimately, they did not kidnap W.R.O.P., but they robbed him of everything he had. *Id*.

172.   W.R.O.P. is afraid of the cartels in Mexico. *Id*. They often stop and board buses to kidnap people, and he believes that if he has to travel to Nuevo Laredo for his next hearing, the same thing might happen to him. *Id*.

173.   W.R.O.P.'s hearings keep getting postponed. *Id*. They have been rescheduled three times now. *Id*. To date, he has not appeared in court. *Id*. His next hearing is scheduled for June 9, 2021, approximately six months from now. *Id*. He will be forced to remain in Mexico until then, and remain in danger because he is a gay migrant. *Id*. Therefore, W.R.O.P. needs to be allowed to enter the United

States and remain here in safety until his court proceedings conclude.

**Facts for Plaintiffs E.J.M.A., J.A.B.M., and O.W.J.M.**

174.   E.J.M.A. and her two sons, J.A.B.M., and O.W.J.M., are natives and citizens of El Salvador. *See* Exhibit 17—Sworn Declaration of E.J.M.A. They fled El Salvador to seek protection in the United States because they were being persecuted by members of the MS-13 gang. *Id*.

175.   J.A.B.M. is bi-sexual. *Id*. MS-13 gang members targeted, kidnapped, and beat him severely, requiring hospitalization. *Id*. E.J.M.A. maintains that gang members and others in El Salvador are extremely homophobic, abusive, and even murder bi-sexual people. *Id*. Therefore, E.J.M.A. fears that she and her sons will suffer future persecution and torture if returned to El Salvador. *Id*.

176.   In October of 2019, E.J.M.A. and her sons entered the United States without inspection by crossing the river near Piedras Negras. *Id*. After walking about three minutes, they came across border patrol agents and were apprehended. *Id*.

177.   E.J.M.A. and her sons were detained at the "icebox" for two days after being apprehended. *Id*. The officer who spoke with E.J.M.A. told her that she could either seek asylum while remaining in Mexico or be deported back to El Salvador. *Id*. E.J.M.A. wanted to tell the officer that she was afraid to return to Mexico, but the officer did not give her an opportunity to speak. *Id*.

178.   After spending two nights in the first "icebox," E.J.M.A. and her sons were

taken to a second "icebox" in Laredo, where they were held for one day. *Id.* They were returned to Mexico and forced to remain there for the duration of their court proceedings. *Id*.

179.   While at the Mexican immigration office, Mexican authorities informed E.J.M.A. that leaving the building was dangerous because cartel members wait outside to kidnap migrants like her and her sons. *Id*. They were given a list of shelters in  Nuevo Laredo and told that a bus could take them to Chiapas. *Id*.

180.   E.J.M.A. and her sons took a taxi with another family to one of the local shelters. *Id*. Unfortunately, there was no room for them, and no other shelter was able to take them in. *Id*. They then arranged for a guard at the shelter to drive them back to the Mexican immigration office. *Id*. The guard left them four blocks from the office so he could avoid the cartels. *Id*. Upon reaching the office, despite being followed, they slept on the floor for the night, with other migrants, hungry and cold, waiting for a bus to take them to Chiapas. *Id*.

181.   E.J.M.A. and her sons boarded the bus the next morning and they managed to disembark at the city of Monterrey, instead of going all the way to the state of Chiapas. *Id*.

182.   Traveling from Monterrey to Nuevo Laredo has been extremely dangerous for E.J.M.A. and her sons. *Id*. Migrants also face great danger in the city of Nuevo Laredo. *Id*. As E.J.M.A. notes, every time she has to travel there, she fears she

or her sons will be kidnapped by cartel members. *Id*. In fact, every time they travel for their hearings, armed cartel members stop them, demand to review their documents, and ask them questions about their court cases and their family members in the United States. *Id*. These stops have caused E.J.M.A. to be in constant fear and panic. *Id*.

183.   Following their February 2020 court hearing, E.J.M.A. and her sons took a taxi to a bus terminal. *Id*. After a while, they noticed that three cars were following them. *Id*. The taxi driver stopped the car, parked it under a bridge, and cartel members got out of the other cars, surrounding the taxi. *Id*. They took J.A.B.M. and O.W.J.M. into their car and began searching and questioning E.J.M.A., J.A.B.M., and O.W.J.M. separately. *Id*.

184.   The cartel members searched the cell phones of E.J.M.A., J.A.B.M., and O.W.J.M. to find contact information for anyone in the United States. *Id*. They found a U.S. number in the pocket of J.A.B.M., which belonged to a pastor at the shelter in Nuevo Laredo, but the cartel members believed that the number was for a a U.S. relative. *Id*. The cartel members aggressively questioned J.A.B.M., grabbing him by the shoulders and shaking him, and asking him whose number it was. *Id*. He told them it was the pastor's number. *Id*. The cartel members confirmed it was the pastor's number and that E.J.M.A., J.A.B.M., and O.W.J.M. had no family contacts in the United States. *Id*. At that point, they

released E.J.M.A., J.A.B.M., and O.W.J.M. *Id*.

185.  During the confrontation, which lasted approximately one hour or so, E.J.M.A. entered into a state of extreme panic. *Id*. She was crying and shaking, pleading with the cartel members to leave them all alone. *Id*. O.W.J.M. had a panic attack, was trembling, and was struggling to breathe. *Id*.

186.  While in Monterrey, E.J.M.A. has been assaulted and robbed on two separate occasions on a bus. *Id*. Both times, E.J.M.A. was the only person targeted on the bus; not a single other passenger helped her. *Id*. She believes that she was the only one targeted because she was a migrant, as she is easily identified by her manner and tone. *Id*.

187.  In addition to being targeted for harm due to her migrant status, E.J.M.A. has struggled to find work in Mexico because she is a migrant. *Id*. She has been denied employment on six different occasions. *Id*. When she does find work, the employer pays her less than her Mexican co-workers.  *Id*.

188.  E.J.M.A. is currently in a state of panic about returning to Nuevo Laredo to attend her court hearings. *Id*. Before her hearings, she cannot sleep and even vomits due to the anxiety she suffers. *Id*. Her sons' health has also been negatively impacted. *Id*. J.A.B.M. struggles to sleep ever since the cartels members confronted them in February of 2020, and O.W.J.M. has frequent nightmares. *Id*.

189.   J.A.B.M., and O.W.J.M. have not been able to develop and obtain an adequate education. *Id*. Initially, E.J.M.A. was able to find schooling in Monterrey for her sons.  *Id*.  While at the school, however, J.A.B.M. was mistreated and discriminated against because he was bi-sexual and a migrant. *Id*. For that reason, E.J.M.A. decided to stop sending J.A.B.M. to school. *Id*.

190.   E.J.M.A. and her sons have had two hearings so far. *Id*. Their last court date was in February of 2020. *Id*. Their next court date has been rescheduled for February 9, 2021. *Id*. It is unclear if that hearing will take place. *Id*. Therefore, E.J.M.A. and her sons will likely be forced to remain in Mexico for an undetermined amount of time. *Id*. Accordingly, they need to be allowed into the U.S. to pursue their asylum cases in safety, until their immigration court proceedings conclude.

## VI. CLAIMS FOR RELIEF

### Count 1 – Violation of the INA and APA (Contiguous Territory Return Provision)

191.   Plaintiffs incorporate by reference the allegations in paragraphs 1-190.

192.   The DHS purports to invoke 8 U.S.C. § 1225(b)(2)(C) as authority for the MPP. However, this statutory section does not apply to Plaintiffs for two reasons.

193.   First, § 1225(b)(2)(C) does not apply to individuals who entered the United States without inspection. It only applies to those who are "arriving," i.e., those individuals who present themselves at a port of entry. *See* 8 C.F.R. §§ 1.2,

1001.1(q); *see also* 8 C.F.R. § 235.3(b) (interpreting § 1225(b)(2)(C) to permit the DHS to force an individual who arrives at a land border port-of-entry from Canada or Mexico to remain in the contiguous country while awaiting their hearings).

194.   Second, § 1225(b)(2)(C) applies only to individuals to whom § 1225(b)(2) applies. It does not apply to those individuals who are eligible for expedited removal proceedings under § 1225(b)(1).

195.   Section 1225(b)(1) applies to those aliens who enter the United States without being inspected and admitted and express a fear of persecution in their country, while § 1225(b)(2) applies only to those aliens who "arrive" in the United States as applicants for admission and meet additional specific statutory criteria.

196.   In this case, Plaintiffs all fall under § 1225(b)(1) because they entered without inspection, were apprehended, and expressed a fear of return to their country of origin. Accordingly, § 1225(b)(2)(C) does not apply to them.

197.   In sum, applying the MPP program to Plaintiffs is contrary to the INA and the federal regulations. Thus, it is being implemented in violation of the APA. *See* 5 U.S.C. § 706(2).

### Count 2 – Violation of the INA and APA (Asylum Law)

198.   Plaintiffs incorporate by reference the allegations in paragraphs 1-197.

199.   8 U.S.C. § 1158 provides that any alien physically present in the United States

may apply for asylum here, regardless of their manner of entry. The MPP blatantly contradicts the plain language of the statute, and thus, it is a violation of Congress' intent when it passed laws relating to asylum seekers.

200.  In this case, Plaintiffs entered the United States without being inspected and were physically present in the United Sates. Therefore, applying MPP to them contravenes the INA and its regulations. Accordingly, it is a violation of the APA. *See* 5 U.S.C. § 706(2).

### Count 3 – Violation of Defendants' Non-Refoulment Duties

201.  Plaintiffs incorporate by reference the allegations in paragraphs 1-200.

202.  Article 33 of the United Nations Convention Relating to the Status of Refugees states: "[n]o Contracting State shall expel or return ('*refouler*') a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of his race, religion, nationality, membership of a particular social group or political opinion." This is known as the duty of non-refoulement.

203.  The principle of non-refoulement is a universal principle and an obligatory norm of customary international law that the United States cannot abrogate, and U.S. courts are bound by it. *See INS v. Doherty*, 502 U.S. 314, 331 (1992) (noting that the United States has a mandatory nonrefoulment obligation under Article 33.1 of the United Nations Convention Relation to the Status of Refugees).

204.   The U.S. government recognizes their duty of non-refoulement because they have enacted statutes and promulgated regulations that ensure an alien has an opportunity to see an immigration judge before being sent to a country where they fear persecution or torture. Under the INA, an individual cannot be removed to a country where it is more likely than not that the individual will face persecution or torture. *See* 8 U.S.C. § 1231(b)(3); *see also* 8 C.F.R. § 208.16.

205.   In this case, Plaintiffs did not receive the appropriate non-refoulement procedures that were consistent with U.S. and international laws because they were forced to go to Mexico unlawfully, even though there is a high likelihood that they will be persecuted or tortured there after already suffering significant persecution and torture.

206.   In sum, the DHS has entirely failed to comply with the non-refoulement procedures, which they are obligated to follow, and have violated Plaintiffs' rights to not be removed to a country where they fear persecution or torture. The DHS has violated its obligations under international law, the INA, its own regulations, and the APA. *See* 5 U.S.C. § 706.

### Count 4 – Violation of the APA's Notice and Comment Provisions

207.   Plaintiffs incorporate by reference the allegations in paragraphs 1-206.

208.   Under 5 U.S.C. § 553, agency rule making cannot be adopted without notice and an opportunity to comment for at least a 30-day period. MPP is a rule.

209. Neither the DHS, nor its sub-agencies, complied with required APA procedures because the government failed to issue a proposed rule and failed to provide an opportunity for public comment with respect to MPP. Rather, the DHS has only issued press releases and unclear guidance on how MPP is to operate.[18]

210. In sum, the MPP is an agency rule that was not presented to the public for comment and violates the notice and comment requirements of the APA.

## Count 5 – Enactment of the MPP is an Arbitrary, Capricious, and Unlawful Agency Action

211. Plaintiffs incorporate by reference the allegations in paragraphs 1-210.

212. Under the APA, a court shall "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law. *See* 5 U.S.C. § 706(2).

213. According to the U.S. Supreme Court, "[t]hough an agency's discretion is unfettered at the outset, if it announces and follows—by rule or by settled course of adjudication—a general policy by which its exercise of discretion will be governed, an irrational departure from that policy could constitute action that must be overturned as arbitrary, capricious [or] an abuse of discretion." *See INS v. Yang*, 519 U.S. 26, 32 (1996).

---

[18] DHS Press Release, Migrant Protection Protocols.
https://www.dhs.gov/news/2019/01/24/migrant-protection-protocols

214.  Prior to MPP, migrants who entered the U.S. without inspection and expressed a fear of persecution in their home country, were allowed to remain in the country while their asylum case proceeded in the immigration court. MPP's new non-refoulement procedures are a drastic departure from prior general policy and such a departure is entirely irrational because the CBP is now sending asylum seekers to a country where there is a high likelihood that they will be persecuted and/or tortured, a fact that the DHS is clearly aware of given the DOS' guidance.[19]

215.  MPP is also an unexplained departure from the DHS's prior interpretation of 8 U.S.C. § 1225(b)(2)(C). As previously noted, § 1225(b)(2)(C) applies only to those aliens who are "arriving." It does not apply to aliens, like Plaintiffs, who have entered the United States without inspection and were apprehended.

216.  Prior to the MPP program's implementation, the DHS interpreted § 1225(b)(2)(C) in accordance with the plain statutory text. Now, however, in an attempt to discourage people from seeking asylum, the DHS has irrationally departed from that interpretation and has determined that all aliens, regardless of their manner of entry, are subject to the MPP. Accordingly, the enactment of the MPP is arbitrary, capricious, and an abuse of discretion.

217.  In addition, the MPP is contrary to law. As noted above, asylum law mandates

---

[19] *See* Footnotes 4-8, *supra.*

that any individual who enters illegally into the United States is eligible to remain in the country until their asylum proceedings have concluded. *See* 8 U.S.C. § 1158. The MPP has changed that by permitting the DHS to expel individuals, like Plaintiffs, who have entered the United States unlawfully and were later apprehended, to Mexico. Therefore, the MPP is in violation of the law and its enactment and procedures are a violation of the APA, because it is an "unlawful agency action."

## Count 6 – Due Process Violation

218.   Plaintiffs incorporate by reference the allegations in paragraphs 1-217.

219.   The Due Process Clause of the Fifth Amendment states that "no person shall…be deprived of life, liberty, or property, without due process of law." *See* U.S. Const. Amend. V.

220.   The U.S. Supreme Court has held that aliens who are in removal or deportation proceedings are entitled to due process under the Fifth Amendment of the U.S. Constitution. *See Reno v. Flores*, 507 U.S. 292, 306 (1993).

221.   In this case, the DHS, through the MPP, has sent Plaintiffs to Mexico, a place where they face threats to their life and liberty. As such, the DHS has violated Plaintiffs' Fifth Amendment due process rights.

222.   Due process also protects aliens from government conduct that "shocks the conscience" or actions that place an individual in substantial risk of harm. *See*

*Irish v. Maine*, 849 F.3d 521, 526 (1st Cir. 2017); *Currier v. Doran*, 242 F.3d 905, 918 (10th Cir. 2001).

223.   Once again, the DHS has sent Plaintiffs to Mexico, a place where, as noted above, their lives are at substantial risk of harm or death. Certainly, this behavior "shocks the conscience" because no rational individual in our society would subject another person to such cruel conditions. As such, the DHS has violated Plaintiffs' Fifth Amendment due process rights.

## VII.   CONCLUSION

224.   For the aforementioned reasons, the application of the MPP program to Plaintiffs is arbitrary, capricious, an abuse of discretion, and not in accordance with the law. Judicial review, under the APA, of the MPP program by this Court is warranted.

## VIII.  PRAYER FOR RELIEF

225.   Wherefore, Plaintiffs respectfully request that this Court:

    a. Issue a declaratory judgment that the MPP and its non-refoulment procedures are unlawful and that Plaintiffs' inclusion in MPP was unlawful;

    b. Enjoin the Defendants from applying MPP to Plaintiffs;

    c. Order that Plaintiffs be allowed to enter the United States and remain here until their removal proceedings have concluded;

    d. Award attorney's fees under the Equal Access to Justice Act, 28 U.S.C. § 2412(d) and 5 U.S.C. § 504;

e.  Order any further relief that this Court deems just and proper.

Respectfully submitted,

*/s/ Raed Gonzalez*
Raed Gonzalez, Esq.
GONZALEZ OLIVIERI, LLC
2200 Southwest Freeway, Suite 120
Houston, Texas 77098
Phone: (713) 481-3040
Fax: (713)588-8683
Texas Bar No. 24010063
rgonzalez@gonzalezolivierillc.com
*Counsel of Record for Plaintiffs*

*/s/ Amanda Waterhouse*
Amanda Waterhouse, Esq.
GONZALEZ OLIVIERI, LLC
2200 Southwest Freeway, Suite 120
Houston, Texas 77098
Phone: (713) 481-3040
Fax: (713)588-8683
Texas Bar No. 24010063
awaterhouse@gonzalezolivierillc.com
*Counsel of Record for Plaintiffs*

*/s/ Alexander Afanassiev*
Alexander Afanassiev, Esq.
GONZALEZ OLIVIERI, LLC
2200 Southwest Freeway, Suite 120
Houston, Texas 77098
Phone: (713) 481-3040
Fax: (713)588-8683
Texas Bar No. 24040393
aafanassiev@gonzalezolivierillc.com
*Counsel of Record for Plaintiffs*

*/s/ Aaron Prabhu*

Aaron Prabhu, Esq.
GONZALEZ OLIVIERI, LLC
2200 Southwest Freeway, Suite 120
Houston, Texas 77098
Phone: (713) 481-3040
Fax: (713)588-8683
Texas Bar No. 24103337
aprabhu@gonzalezolivierillc.com
*Counsel of Record for Plaintiffs*

*/s/ Jodi Goodwin*

Jodi Goodwin, Esq.
LAW OFFICE OF JODI GOODWIN
1221 East Harrison Avenue
Harlingen, Texas 78550
Phone: (956) 428-7212
Fax: (956) 428-7360
SBN:  00793835
Fed ID:  20102
jodigoodwin@sbcglobal.net
*Counsel of Record for Plaintiffs*

/s/ *Amber Gracia*

Amber Gracia
State Bar # 24098056
SDT # 2799045
Law Office of Amber Gracia, PLLC
2200 Southwest Frwy., Ste. 320
Houston, Texas 77098
Tel: (832) 853-0896
ambergracialaw@gmail.com
*Counsel of Record for Plaintiffs*

57

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**BROWNSVILLE DIVISION**

| | |
|---|---|
| K.P.P.R., A.J.V.P, A.C.C.C., A.C.C.C., R.C.A.P., J.R.A.M., R.C.A.M., J.S.S.S., R.R.S., J.M.A., K.J.P.M., E.M.C., A.B.C.C., O.D.C.C., C.J.C.C., D.C.M.V., G.J.M.V., Y.A.C.B., D.J.U.V., W.R.O.P., E.J.M.A., J.A.B.M., O.W.J.M., individually, and on behalf of all Class members, | Case No. 1:21-cv-7 |
| *Plaintiffs*, | |
| v. | |
| Chad F. Wolf, Acting Secretary of the Department of Homeland Security; Mark A. Morgan, Acting Commissioner of U.S. Customs and Border Protection; Jeffrey Rosen, Acting Attorney General; Donald J. Trump, President of the U.S. | Date: January 11, 2021 |
| *Defendants*. | |

## INDEX OF EXHIBITS

Exhibit 1—Sworn Declaration of K.P.P.R.

Exhibit 2—Form I-213 for K.P.P.R.

Exhibit 3—Photos of Living Conditions at Camp

Exhibit 4—Sworn Declaration of A.C.C.C.

Exhibit 5—Form I-213 for A.C.C.C.

Exhibit 6—Sworn Declaration of R.C.A.P.

Exhibit 7—Form I-213 for R.C.A.P.

Exhibit 8—Sworn Declaration of J.S.S.S.

Exhibit 9—Form I-213 for J.S.S.S.

Exhibit 10—Sworn Declaration of J.M.A.

Exhibit 11—Form I-213 for J.M.A.

Exhibit 12—Sworn Declaration of E.M.C.

Exhibit 13—Form I-213 for E.M.C.

Exhibit 14—Sworn Declaration of D.C.M.V.

Exhibit 15—Sworn Declaration of Y.A.C.B.

Exhibit 16—Sworn Declaration of W.R.O.P.

Exhibit 17—Sworn Declaration of E.J.M.A.

Exhibit 18—2020 Human Rights First Report on MPP

Exhibit 19—Congressional Follow Up Letter on Inquiry into Placement of LGBT Migrants in MPP

Exhibit 20—Letter from AILA, AIC, HRF, TCRP to Chad Wolf